

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

HENRY E. KRENING,

    Plaintiff,

    vs.                          Case No. 13-CV-274-J

UNION PACIFIC RAILROAD,

    Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant's motion for summary judgment (Doc. 46), the plaintiff's response in opposition to the motion (Doc. 50), and the defendant's further reply (Doc. 53) are before the Court. Having reviewed the parties' written submissions, the pleadings and all matters of record, and the applicable law, the Court finds and orders as follows.

### FACTS

This case is about Henry Krening and Edgar Dickens, both UPRR employees. UPRR hired Krening on May 27, 1994. Krening worked in various positions between 1994 and June 2013. Most recently, between 2010 and June 2013, Krening worked as a Foreman General 1 at the UPRR Steam Locomotive Shop ("steam shop") in Cheyenne, WY. Doc. 47, Ex. C, Amended Complaint at ¶¶ 15 & 35; Ex. A, Krening Depo. 13:10-14.

In 2005, Dickens worked in the steam shop with Krening under the management of Steven Lee. Krening asserts UPRR removed Dickens from the steam shop because he created a

1

hostile and unsafe work environment that resulted in numerous employee complaints about

Dickens.  In 2010, UPRR promoted Dickens to Manager, Heritage Equipment and Facilities,

which resulted in him managing the steam shop and supervising Krening. Doc. 47, Ex. C,

Amended Complaint at ¶ 16; Ex. A, Depo. 19:11-18; 40:10-12; Ex. C, Dickens Depo. 15:23-

16:5. After his promotion, Dickens promoted Krening, then 54 years old, to the Foreman General

1 position.  Doc. 47, Ex. A, Depo. 42:4-8.   Dickens never disciplined Krening while he was

Krening's manager.  Doc. 47, Ex. A, Depo. 70:19-20. Krening and Dickens got along in 2010

and 2011. Doc. 47, Ex. A, Krening Depo. 48:24-49:13.

Krening alleges that in 2012, his relationship with Dickens changed because Dickens was

attempting to use Krening to get rid of other employees. Doc.47, Ex. A, Depo. 49:16-21. Krening

asserts that Dickens was attempting to use him to get rid of other employees because Dickens

asked Krening his opinion about five workers (Ed Smith, Chris Havener, Ron Tabke, Jack

Holland, and Randy Quinlan) who eventually retired, left, or transferred. Doc. 47, Ex. A,

Krening Depo. 50:7-59:7; 60:13-67:25.   Krening speculates, but admits he does not know the

circumstances of these employees' departures.  *Id*. Krening asserts that UPRR terminated Tabke

because he watched special agents escort Tabke from the shop. Doc. 47, Ex. A, Krening Depo.

60:13-67:25. Krening, however, does not know why the special agents removed Tabke from the

shop*. Id*.

In May 2013, Krening's wife found him lying unconscious at home. He was hospitalized

and diagnosed with Type 2 Diabetes and hyponatremia Doc. 47, Ex. A, Depo. 186:19-187:8; Ex.

A, Depo. 72:9-13. After Krening was released from the hospital, he returned to work. Doc. 47,

Ex. A, Depo. 77:6-20.  After returning to work, however, Krening lost consciousness again in the

locker room.  Doc. 47, Ex. A, Depo. 194:20-195:4. Krening took a medical leave of absence on June 2013.  Doc. 47, Ex. A, Depo. 195:5-7. As of May 26, 2016, Krening remains an employee of UPRR.  After going on medical leave, Krening filed a Charge of Discrimination in September of 2013, alleging age discrimination based on the foregoing allegations with the Wyoming Department of Workforce Services.  Doc. 47, Exhibit E, Charge, authenticated at Exhibit D, Declaration of Hedican at ¶ 3; Exhibit F, Dismissal and Determination, authenticated at Exhibit D at ¶ 4.

Krening contends that his supervisor, Edgar Dickens ("Dickens") subjected Plaintiff to age related harassment from April 2010 to June 3, 2013.  Krening, in his Amended Complaint, Doc. 24, bring the following claims against Defendant: 1) intentional infliction of emotional distress; 2) negligent infliction of emotional distress; 3) negligent hiring, 4) negligent retention, 5) negligent supervision of Krening's supervisor, Dickens; and 6) age discrimination and hostile work environment.

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute of fact is genuine if a reasonable juror could resolve the disputed fact in favor of either side.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of fact is material if under the substantive law it is essential to the proper disposition of the claim.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).  When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor."  *Anderson*, 477 U.S. at 255.

The party moving for summary judgment has the burden of establishing the nonexistence of a genuine dispute of material fact. *Lynch v. Barrett*, 703 F.3d 1153, 1158 (10th Cir. 2013). The moving party can satisfy this burden by either (1) offering affirmative evidence that negates an essential element of the nonmoving party's claim, or (2) demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *See* Fed. R. Civ. P. 56(c)(1)(A)–(B).

Once the moving party satisfies this initial burden, the nonmoving party must support its contention that a genuine dispute of material fact exists either by (1) citing to particular materials in the record, or (2) showing that the materials cited by the moving party do not establish the absence of a genuine dispute. *See id.* The nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive a summary judgment motion, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Further, when opposing summary judgment, the nonmoving party cannot rest on allegations or denials in the pleadings but must set forth specific facts showing that there is a genuine dispute of material fact for trial. *See Travis v. Park City Mun. Corp.*, 565 F.3d 1252, 1258 (10th Cir. 2009).

When considering a motion for summary judgment, the court's role is not to weigh the evidence and decide the truth of the matter, but rather to determine whether a genuine dispute of material fact exists for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact-finder, not the court. *Id.* at 255.

4

DISCUSSION

1.      **Negligence claims under FELA**

Enacted by the United States Congress in 1908, Federal Employers Liability Act,

(FELA), provides the exclusive remedy to employees who have sustained injury or contracted an

occupational disease while employed by a rail carrier. *Chicago, R. I. Ry v. Schendel*, 270 U.S.

611 (1925). The relevant provision of the Act states as follows:

> Every common carrier by railroad while engaging in commerce between any of
> the several states . . . shall be liable in damages to any person suffering injury
> while he is employed by such carrier in such commerce…for such injury or death
> resulting in whole or in part from the negligence of any of the officers, agents, or
> employees of such carrier . . ..

45 U.S.C. § 51.

In the context of negligent infliction of emotional distress under FELA, the United States

Supreme Court has adopted "the zone of danger test, which limits recovery for emotional injury

to those plaintiffs who either sustain a physical impact as a result of the defendant's negligence

or are placed in immediate risk of physical impact by that negligence." *Consolidated Rail Corp.

v. Gottshall*, 512 U.S. 532, 534 (1994). "This is the only common-law test that exhibits both

significant historical support and continuing vitality sufficient to inform the Court's

determination of the federal question of what constitutes FELA 'negligence' in this context." *Id*.

The Court stated:

> This test is consistent with FELA's broad remedial goals and with the statute's
> purpose of alleviating the physical dangers of railroading. Even if respondents are
> correct that the zone of danger test arbitrarily excludes some emotional injury
> claims, that test best reconciles the concerns motivating the common-law
> restrictions on recovery for negligently inflicted emotional distress—the potential
> for a flood of trivial suits, the possibility of fraudulent claims that are difficult to

5

detect, and the specter of unlimited and unpredictable liability—with this Court's
FELA jurisprudence.

*Id.* (citations omitted). The Supreme Court went on to explain:

> Under this test, a worker within the zone of danger of physical impact will be able
> to recover for emotional injury caused by fear of physical injury to himself,
> whereas a worker outside the zone will not. Railroad employees thus will be able
> to recover for injuries—physical and emotional—caused by the negligent conduct
> of their employers that threatens them imminently with physical impact. This rule
> will further Congress' goal in enacting the statute of alleviating the physical
> dangers of railroading. *Id.* at 556.

 "Whether an employee's claim satisfies the zone of danger test is a legal question . . .." *Smith v.*

*Union Pacific R. Co.*, 236 F.3d 1168, 1170 (10th Cir. Okla. 2000).

Under FELA, Plaintiff brings the following negligence claims: 1) negligent infliction of

emotional distress; 2) negligent hiring, 3) negligent retention, and 4) negligent supervision of

Krening's supervisor, Dickens.  Defendant argues that Krening's negligent infliction claim does

not meet the "zone of danger test" and should be dismissed on that basis alone.  Doc. 47, p. 14.

Krening takes Defendant's analysis a step further and admits that Krening was not in the zone of

danger as required under *Gottshall* and concedes that all Krening's negligence claims must be

dismissed.  Accordingly, the Court grants summary judgment in favor of Defendant on the

following claims: 1) negligent infliction of emotional distress; 2) negligent hiring, 3) negligent

retention, and 4) negligent supervision of Krening's supervisor, Dickens.

### 2.       Intentional Infliction of Emotional Distress

Krening brings a claim of Intentional Infliction of Emotions Distress under FELA.  Both

parties recognize that whether such a claim is cognizable under FELA is unsettled.  Defendant

argues that the majority of courts have held that some underlying physical harm must be

involved for the claim to survive.  Doc. 47, p. 15.  In support, Defendant cites to *Goodrich v. Long Island R.R. Co.*, 654 F.3d 190 (2d Cir. 2011).  Defendant urges that Krening's evidence is devoid of any intentional threat of physical injury by Dickens' and thus, Krening's intentional infliction claim should be dismissed.

Krening argues that in an intentional infliction of emotional distress case, the emotional injury is intended and thus there need not be a physical impact or threat of physical impact that results in emotional injury.  Krening asserts that if a person intentionally inflicts emotional distress on the victim, the victim is clearly in the "zone of danger." Doc. 50, p. 23. As an alternative, Krening points out that Wyoming recognizes a claim for intentional infliction of emotional distress, outlines the elements, and cites to *Leithead v. American Colloid Co.*, 721 P.2d 1059 (Wyo. 1986).  Krening argues that based on the zone of danger test or the test adopted by the Wyoming Supreme Court in *Leithead*, Krening's claim for intentional infliction of emotional distress would likely be recognized under FELA by the Tenth Circuit Court of Appeals and the Supreme Court.  Krening cites the following facts in support of his argument: (1) UPRR promoted Dickens despite his rocky history with employees that he would now supervise; (2) UPRR was unconcerned about the purge of older employees that took place upon Dickens' promotion; and (3) Dickens constantly criticized older employees' work product, referred to them as the "Old Regime," demeaned them, gave important jobs to younger employees, and openly yearned for young blood.  Doc. 50, p. 24.  Krening argues that he "wouldn't last as Foreman General not because he couldn't, but because Dickens would see to

it." Doc. 50, p. 24.  Krening cites to the number of individuals (two) over the age of 50 years old

who remain in the steam shop.[1]

As discussed by Defendant, this Court has already reviewed the issue of whether a claim

for intentional infliction of emotional distress is cognizable under FELA in *Miller v. UPRR*, 14-

CV-47. Chief Judge Nancy Freudenthal included a thorough discussion in her Order Granting

Defendant's Motion for Summary Judgment. 14-CV-47, Doc. 68. Although lengthy, the Court

will quote the discussion in its entirety.

> This Court finds that the Supreme Court opinion in *Gottshall*, while expressly
> disclaiming any ruling on claims for intentional infliction of emotional distress, is
> helpful in considering this issue. In *Gottshall*, the Supreme Court noted that it
> liberally construed FELA to further Congress' remedial goal. Finding that FELA
> was silent on the issue of negligent infliction of emotional distress, the Supreme
> Court found that common law principles played a significant role in their
> decision. *Gottshall*, 512 U.S. at 544. The Supreme Court then went on to consider
> the right of recovery in light of common law. *Id*. The Court recognized that
> almost all courts had found a right to recover for negligent infliction of emotional
> distress. The Court then went on to consider the limits of such a claim. *Id*.
>
> In considering the applicable frame work in *Gottshall*, the Court finds that it is
> likely both the Tenth Circuit and the Supreme Court would recognize a claim for
> intentional infliction of emotional distress under FELA. *Gottshall* found that
> FELA recognizes claims for purely emotional injuries. The Supreme Court has
> also recognized claims for intentional torts. See *Harrison v. Missouri Pac. R. Co*.
> 372 U.S. 248, 249 (1963)("we have held that the fact that the foreseeable danger
> was from intentional or criminal misconduct is irrelevant; respondent nonetheless
> had a duty to make reasonable provision against it." (citation and quotation marks
> omitted)). Additionally, most states recognize some form of claim for intentional
> infliction of emotional distress. In the same way that the *Gottshall* found "a
> railroad has a duty under FELA to avoid subjecting its workers to negligently

---

[1] With regard to Plaintiff's age discrimination claim, the Court will not consider Plaintiff's
statistical analysis because Plaintiff has not demonstrated that those who have left the shop are
similarly situated individuals whose leaving was tied to discriminatory explanations. *See Cone
v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 532-33 (10th Cir. 1994) "[A] plaintiff's statistical
evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment
by showing disparate treatment between *comparable* individuals." *Fallis*, 944 F.2d at 746
(emphasis in original).

inflicted emotional injury", the Court finds there is a duty to avoid subjecting workers to intentionally inflicted emotional injury.

Having found it is likely that the Supreme Court would recognize a FELA claim for intentional infliction of emotional distress, the next issue is the contours of such a claim. The Court finds the Second Circuit case of *Goodrich v. Long Island Rail Road Co.*, 654 F.3d 190, 196 (2nd Cir. 2011) instructive. In *Goodrich*, the Second Circuit addressed the question of whether the zone of danger applied to a claim for intentional infliction of emotional distress. In considering the issue, the Court recognized that:

> It is true that the common law does not currently impose a zone of danger test on IIED claims. The Restatement (Second) of Torts defines the tort in these terms: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restatement (Second) of Torts § 46(1) (1965). This approach has been followed by most, if not all, American jurisdictions, see Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 45, Reporter's Note, cmt. a (Tentative Draft No. 5, 2007) (collecting cases), albeit not without reservation in some cases, see, e.g., *Supervalu, Inc. v. Johnson*, 276 Va. 356, 370, 666 S.E.2d 335 (2008) ("[T]he tort of intentional infliction of emotional distress is 'not favored' in the law, because there are inherent problems in proving a claim alleging injury to the mind or emotions in the absence of accompanying physical injury.").

*Goodrich*, 654 F.3d at 196-97.  However, the Court went on to find that:

> Neither FELA's terms nor any court decision of which we are aware supports expanding the injuries for which recovery is available under FELA to include those occurring outside a zone of physical danger. The IIED claim is a tort unbounded by any connection to the dangers originally prompting Congress to protect railroad workers through enactment of FELA—a tort, in the words of the New York Court of Appeals, "as limitless as the human capacity for cruelty." Howell, 81 N.Y.2d at 122, 596 N.Y.S.2d 350, 612 N.E.2d 699. In contrast, as the Supreme Court has stated, "an emotional injury constitutes 'injury' resulting from the employer's 'negligence' for purposes of FELA only if it would be compensable under the terms of the zone of danger test." *Gottshall*, 512 U.S. at 555, 114 S.Ct. 2396. The fact that an "injury" of this type results from an intentional act for which the employer is responsible rather than from "mere inadvertence or carelessness" does not excuse the employer from liability under FELA. See Jamison, 281

9

U.S. at 641, 50 S.Ct. 440. We see no reason, however, why the same definition of injury should not apply in the NIED and IIED contexts. Goodrich, 654 F.3d at 198-99.

This Court agrees with the reasoning of the Second Circuit that any claim for intentional infliction of emotional distress must also meet the zone of physical danger test.

Accordingly, the Court will proceed with its analysis to determine whether Krening establishes that there are genuine issues of material fact related to whether he meets the elements of intentional infliction of emotional distress claim under Wyoming law with the added element of the zone of danger test.  Looking again to *Miller v. UPRR*, 14-CV-47, the Court discussed the parameters of establishing outrageous conduct as follows:

Since the Supreme Court has never recognized a claim for intentional infliction of emotional distress in the FELA context, there is no definitive test for the conduct required to establish "extreme and outrageous conduct." However, the Wyoming Supreme Court has explained the contours of outrageous conduct by quoting from the Restatement of Torts:

Extreme and outrageous conduct. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Worley v. Wyoming Bottling Co., Inc.*, 1 P.3d 615, 629 (Wyo. 2000). The Wyoming Supreme Court has recognized both the Court and jury play a role in determining a claim of validity:

It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to

10

permit recovery, or whether it is necessarily so. Where reasonable men may
differ, it is for the jury, subject to the control of the court, to determine
whether, in the particular case, the conduct has been sufficiently extreme
and outrageous to result in liability.

*Id.* at 628 (citations omitted).  The Court finds this definition is similar to most
definitions of "extreme and outrageous" conduct and would likely match any
definition used by either the Tenth Circuit or the United States Supreme Court.

The Court looks to *Worley* as guidance.  In *Worley,* an employer harassed an employee

by repeatedly threatening to terminate his employment, demanding impossibly large increases in

sales, withheld a periodic pay raise, humiliated and vilified him for minor infractions, demoted

him, took away his company car, cut his pay by $11,000. *Id.* at 628–29.  The parties disagreed

about whether the employee quit or was terminated. *Id.* at 620.  After leaving the job, the

employee was treated for severe clinical depression. *Id.* at 629.  The Wyoming Supreme Court

held that none of these facts alone demonstrates the employer's conduct was outrageous, but

went on to recognize that the employer-employee relationship is a significant factor in

determining outrageousness that does not lower the threshold for determining liability. *Id.* at

629.  The Wyoming Supreme Court held that although it was a close call, there was sufficient

evidence to find that reasonable men may differ regarding whether the actions of the employer

toward its employee were extreme and outrageous. *Worly*, 1 P.3d 615 (Wyo. 2000).

Using *Worley* as guidance, believing all the facts and circumstances alleged by Krening

as true, the Court does not find that the facts alleged in the instant case rise to the level to which

reasonable men could differ about whether Defendant's actions were outrageous.  The Court

finds that unlike in *Worley*, most of Krening's allegations focus not on the way Dickens

specifically treated Krening, but on how Dickens treated the entire steam shop or older workers

in the steam shop. It is counterintuitive for Krening to use indirect evidence of discrimination (a

11

purge of older employees, general demeaning of older employees and criticism of their work product, giving younger employees important jobs, statistics of the number of older workers who remain employees in the steam shop, etc.) to establish that Dickens' conduct was outrageous, extreme, and intentional.  The generalized nature of Krening's allegations demonstrates to the Court that contrary to Krening's argument, the "bull's eye" was not squarely on Krening, but Dickens' alleged bull's eye was on every member of the alleged "Old Regime."  The Court finds it telling that Dickens never formally disciplined Krening and that Krening did not give specific examples of how Dickens "saw to" Krening not lasting as the Foreman General. As such, the Court finds that Defendant's behavior does not meet the standard of extreme and outrageous. Accordingly, the Court grants summary judgment in favor of Defendant on Krening's claim of intentional infliction of emotional distress.

### 3.      Age discrimination claim

In count four of his Amended Complaint, Krening alleges that Union Pacific discriminated against him based on his age.[2]  Krening asserts in the Amended Complaint that Dickens' abusive, age-based, and derogatory conduct toward Krening was severe, pervasive, and negatively affected Krening's work environment.  Krening claims he was constructively discharged because he was forced to take medical leave.

---

[2] Krening does not specifically assert a claim for relief under the Age Discrimination and Employment Act, 29 U.S.C. § 621, but purports to bring his claim under 42 U.S.C.§ 1983.  After Defendant raised the issue that the ADEA is the exclusive judicial remedy for claims of age discrimination in its Brief in Support of its Motion for Summary Judgment (Doc. 47), Krening framed his response as a claim under the ADEA.  Accordingly, the Court will address his claim as an ADEA claim.

The ADEA prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "[T]o succeed on a claim of age discrimination, a plaintiff must prove by a preponderance of the evidence that her employer would not have taken the challenged action but for the plaintiff's age." *Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273, 1277 (10th Cir. 2010). The "protected class" for purposes of the ADEA is that class of individuals who are at least 40 years of age. 29 U.S.C. § 631(a).

Krening does not claim to have direct evidence of age discrimination. Where direct evidence of discrimination is absent, the Court analyzes age discrimination claims under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Jones,* 617 F.3d at 1278. Under *McDonnell Douglas,* the plaintiff first bears the burden of establishing a *prima facie* case of age discrimination. If the plaintiff carries this burden, the employer must then come forward with some legitimate, non-discriminatory reason for the adverse employment action. If the employer succeeds in this showing, the burden shifts back to the plaintiff to show that the employer's proffered justification is pretextual. *Jones*, 617 F.3d at 1278.

The Tenth Circuit Court of Appeals has not consistently articulated the second and fourth elements of a *prima facie* case. *See Jordt v. FedEx Freight, Inc.*, No. 2:13-CV-481 CW, 2015 WL 364580, at *1 (D. Utah Jan. 27, 2015) (unpublished) (discussing the different elements that the Tenth Circuit Court of Appeals has articulated for a *prima facie* case of age discrimination). Both parties cite the prima facie elements of an age discrimination claim from *Jones v. Oklahoma City Pub. Sch.* in their briefing. 617 F.3d 1273, 1279 (10th Cir. 2010). As such, the

Court will look to the *prima facie* elements as articulated in *Jones*.  To prove a prima facie case

of age discrimination, Krening must show: "1) [he] is a member of the class protected by the

[ADEA]; 2) [he] suffered an adverse employment action; 3) [he] was qualified for the position at

issue; and 4) [he] was treated less favorably than others not in the protected class." *Id.* at 1279.

### a.  Parties' arguments regarding Krening's prima facie case

It is undisputed that Krening was in the protected group, over the age of 40.  Thus,

Krening satisfies the first element of a prima facie case.  Defendant argues that Krening cannot

establish the remaining three elements; specifically that (1) Krening did not suffer an adverse

employment action because he is still employed; (2) Krening is not qualified for the position at

issue because he currently unable to perform his job in the steam shop due to his medical

condition; (3) Krening was not treated less favorably than younger employees; and (4) Krening

cannot prove that age was the but-for cause of any action.

In response, Krening argues that Defendant discriminated against Krening and ultimately

constructively discharged him because of his age.  Krening urges that it is undisputed that

Krening suffered an adverse employment action based on the affidavits of Steven Lee, Carolin

Chavez, and Plaintiff's deposition.  Specifically, Krening argues that Dickens reassigned

Krening's job duties to a 28-year old, micromanaged, scrutinized and demeaned Krening, falsely

accused Krening of doing a poor job and damaging equipment, made jokes about Krening's age,

made Krening live in fear of losing his job, made comments about needing younger or new blood

and getting rid of the "Old Regime", and ultimately made the work environment so toxic and

intolerable that Krening "lost his physical and mental health and was forced to leave" and was

constructively discharged.  Krening argues that it is undisputed that Krening was qualified for

14

the job because he worked in the steam shop for 20 years and Dickens admitted he was a hard worker. Krening further points out that Dickens treated his 28-year old protégé and Krening's replacement, Austin Barker, more favorably than Krening.

Krening also uses the following to support his arguments:

- Dickens' admission in his deposition that he called Krening an asshole.

- Rick Branschweig's (a steam shop employee until 2011) sworn statement that Dickens made inappropriate age-based comments on two separate occasions and that he retired early because of the toxic work environment created by Dickens. Doc. 50, Exhibit EE.

- Ed Smith's (a steam shop employee until 2012) sworn statement that he retired because he could not put up with Dickens, Dickens was a bully, and Dickens made two comments to him about his age. ("You know, we've seen this over the years. As guys get closer to retirement, they back off and don't do what they should." And "You know, as guys get older, they slack off.") Doc. 50, Exhibit FF.

- Dave Varelik's (a steam shop employee in 2005 and 2006) sworn statement that Dickens used to make comments about "'needing to get younger blood' because the older guys were 'stuck in the past'" and about younger guys having better ideas. Doc. 50, Exhibit GG.

- Charlie Cross's (a steam shop employee from 2012 to 2014) sworn statement that Dickens used the phrase "Old Regime" frequently when talking about a group of men that included Krening, Dickens never gave important jobs to senior members

of the crew, and Dickens created a hostile work environment through his attitude and deceitfulness toward him and his fellow coworkers. Doc. 50, Exhibit HH.

- Carolin Chavez's sworn statement that Dickens singled out many of the older employees and degraded their work; Dickens made it clear that Krening's age affected his work and Dickens had plans for Austin second to everything Krening did; Dicken made rude and inappropriate comments about how the Old Regime needed to go; Dickens relied on Austin Barker's opinion over Krening's; Dickens dragged Krening through the mud and placed Krening in an unsafe working environment; Dickens refused to pull Krening out of service for medical purposes knowing there was something wrong with him; and Dickens told Chavez that Krening was weak and wouldn't last as Foreman General. Doc, 50 Exhibit II.

- John Rimmasch (an independent contractor) "had the impression that Dickens did not like the older guys on the crew" and discussed with him the need to get new, younger people involved.  Doc. 50, Exhibit KK.

In its reply, Defendant argues "inadmissible 'old news' cannot preclude summary judgment."  Defendant reviews all of the affidavits cited by Krening and concludes that the affidavits do not create any issues of material fact because (1) Braunschewig, Varilek, Rimmasch, Smith and Lee's affidavits are based on outdated allegations and thus not focused on the plaintiff's workplace and the plaintiff's conditions of employment; (2) Charlie Cross's affidavit refutes Krening's age discrimination claim because Cross claims to have experienced a hostile work environment at the hands of Dickens and Cross was in his 20s at the time relevant to this complaint; and (3) Carolin Chavez's testified that the term "Old Regime" meant the former

16

crew, not age. Chavez's conjecture that Dickens ended the employment of Smith, Tabke,

Holland and Eggeman because of age is baseless because they retired or transferred and she

states that Dickens forced Turner out too and he was in his 20s. And finally, Chavez's

unsupported allegation regarding Krening's unsafe work condition was merely her own opinion

that Krening should not have been working excessive hours because of his health, not his age.

Defendant concludes that the conclusory affidavits contain irrelevant allegations that cannot

defeat summary judgment.

### b. Constructive discharge and adverse employment action

First, the Court will analyze whether Krening suffered an adverse employment action.

Krening argues that he was constructively discharged.  A constructive discharge meets the

requirement of an adverse employment action—materially adverse to the employee's job status.

*Fischer v. Forestwood Co.*, 525 F.3d 972, 979 (10th Cir. 2008).

> The plaintiff's burden in establishing constructive discharge is substantial.  *EEOC v. PVNF, LLC,* 487 F.3d 790, 805 (10th Cir.2007); *see also Garrett v. Hewlett–Packard Co.,* 305 F.3d 1210, 1221 (10th Cir.2002) (explaining "[t]he bar is quite high in [constructive discharge] cases"). A constructive discharge occurs only "when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign." *Exum,* 389 F.3d at 1135.

*Id.*

> In determining whether an employee's working conditions would cause such feelings in a reasonable person, we apply an objective test under which neither the employee's subjective views of the situation, nor her employer's subjective intent with regard to discharging her, are relevant. *See Jeffries v. Kansas,* 147 F.3d 1220, 1233 (10th Cir.1998). The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions. *See id.* Further,

> conduct which meets the definition of a "tangible employment action" or an "adverse employment action" is not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable. *Cf. Mallinson–Montague v. Pocrnick*, 224 F.3d 1224, 1231–32 (10th Cir.2000) (distinguishing constructive discharge from tangible employment action).

*Tran v. Trustees of State Colleges in Colorado*, 355 F.3d 1263, 1270–71 (10th Cir. 2004). "The existence of constructive discharge is an issue of fact to be resolved by the jury, and judgment as a matter of law is only appropriate if the evidence is susceptible to but one interpretation." *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1228–29 (10th Cir. 2009).

The parties agree that Krening remains Defendant's employee. The parties dispute whether a plaintiff who takes a medical leave of absence, but remains employed, can bring a claim for constructive discharge since he or she did not quit or resign. The Tenth Circuit has clearly left this question unanswered.[3] The Court, *only for the purposes of this order*, will assume that an employee forced to take medical leave through unlawful actions by his employer that created an intolerable work environment is analogous to an employee quitting or resigning in a constructive discharge claim. Thus, the Court will analyze, by looking at the totality of the circumstances, whether Krening demonstrated that there are genuine issues of material facts in the record that support his assertion that Dickens' age-based, discriminatory acts and other

---

[3] "Strickland argues her subjective intent as to whether she was permanently quitting or temporarily taking leave is irrelevant, since the standard for constructive discharge is objective. In light of our holding that the evidence could support a finding of intent to quit, we leave open the question of whether a subjective intent to quit is a necessary element of constructive discharge. *See, e.g., White v. Honeywell, Inc.,* 141 F.3d 1270, 1279–80 (8th Cir.1998)." *Strickland v. United Parcel Serv., Inc.,* 555 F.3d 1224, 1229 (10th Cir. 2009)

18

aggravating factors made his working conditions so intolerable that a reasonable person would

have felt compelled to take a medical leave of absence.[4]

In his response brief, Krening specifically relies on the following to support his

constructive discharge, as an adverse employment action, argument:

> It is undisputed that he suffered adverse employment action and that Dickens'
> age-based animus was revealed in a variety of ways.  The affidavits, particularly
> of Steve Lee and Carolin Chavez, the depositions, including Plaintiff's deposition,
> describe clearly what Ed Dickens did to Henry Krening. Some of his job duties
> were reassigned to a 28-year-old young man, his work was micromanaged,
> scrutinized, and demeaned, he was falsely accused of taking short cuts and failing
> to do his work competently, because of what he observed happening to the rest of
> the "old regime," was made the brunt of jokes, was falsely accused of damaging
> equipment, and lived in constant fear of losing his job, and ultimately he was
> 'constructively discharged' when the work environment became so toxic and
> intolerable that he could no longer remain.

The Court has reviewed each affidavit carefully and will address each in turn.

- The Court finds that Steve Lee's affidavit is irrelevant to whether Krening was

  constructively discharged.  Steve Lee retired from UPRR in 2010.  Steve Lee

  stated that "virtually all of [his] interactions with Dickens occurred prior to [his]

  retirement on 12-31-10. Since then [he] has not had more than 2 or 3 very short

  conversations with [Krening]." Doc. 50-1, p. 44.  His affidavit focuses on

  Dickens' time in the shop during 2005 and 2006.  Lee admitted in his deposition

  that he had no first-hand knowledge of anything that happened in the steam shop

  after he retired. Doc. 53, Ex. G, Lee Depo. 38:9-12.  As such, Steve Lee cannot

  attest to the working conditions in steam shop after 2010 and his affidavit does

---

[4] It is worth noting that Krening does not bring a disability claim, but his claims are based solely
on age discrimination.

not create a genuine issue of material fact related to whether Krening's work
environment in 2013 was so intolerable that a reasonable person would feel
forced to take medical leave.

- Rick Braunschweig's affidavit refers to three comments Dickens made about age,
  two of which occurred prior to Dickens' becoming the manager of the shop, and
  one was made about Lynn Nystrom to Braunschweig.  The Court will not
  consider Braunschweig's statement about Dickens' comments about age before
  Dickens became manager of the shop because Braunschweig did not provide any
  detail regarding the comments and these comments do not create a genuine issue
  of fact related to whether Krening's work environment in 2013 was so intolerable
  that a reasonable person would feel forced to take medical leave.  Doc. 50-1 p.
  47.

- Ed Smith's affidavit refers to two age based comments Dickens made directly to
  Ed Smith in 2012, states that Dickens had something against the older guys on
  the crew, and states that Ed Smith retired because he could not put up with the
  behavior of Dickens anymore.  Doc. 50-1, p. 49.  The Court will consider Ed
  Smith's affidavit in its analysis.

- The Court will not consider Dave Varilek's affidavit because it is unsigned. Doc.
  50-1, p. 51.[5]

- Charlie Cross's affidavit states that Dickens used the term "Old Regime" and
  never gave any of the available important tasks to senior members of the crew

---

[5] Even if the Court were to consider Varilek's affidavit, it would not alter its conclusion.

like Jack Holland.  Charlie Cross is in his twenties.  He states that he was "tired

of the hostile work environment created by Dickens, his deceitfulness toward

fellow co-workers and myself, and his attitude." Doc. 51-1, p. 54. The Court will

consider Charlie Cross's affidavit in its analysis.

- Carolin Chavez worked at the steam shop with Krening under Dickens'
  leadership.  In her affidavit she lists the following things that created an
  intolerable work environment: (1) Dickens created hostility within the shop; (2)
  Dickens valued Austin Barker's work over Krening's; (3) Dickens harassed Ed
  Smith and Jack Holland; (4) Dickens made comments that he couldn't wait to
  have younger employees; (5) Dickens changed employee's job duties on a
  regular basis; (6) Dickens called the steam shop a dictatorship and called himself
  the dictator; (7) Dickens slowly placed Krening in an unsafe working condition
  on multiple occasions. Krening ended up in the emergency room multiple times
  due to Dickens' harassment and discrimination; (8) Dickens refused to pull
  Krening out of service for medical purposes knowing there was something wrong
  with him; (9) It was apparent that Dickens stressed Krening out; (10) Dickens
  told Chavez that Krening was weak and wouldn't last as Foreman General; and
  (11) Dickens was worried about himself and made that clear as well during the
  time that Krening was suffering.  The Court will consider Chavez's affidavit.

In his deposition, Krening claimed the following were "demeaning" actions that Dickens

took against him: (1) Dickens called Krening a dickhead; (2) Dickens started telling Krening to

go ask Austin Barker, a younger employee, what Barker thought about things; (3) Dickens would

instruct Krening to give a person instructions and then change his mind and make Krening

correct the instructions; (4) Dickens told Krening he was taking shortcuts on an engine and asked

Krening what was wrong with him. Krening started shaking and when Dickens asked Krening

why he was shaking, Krening responded "because you scare the fuck out of me."; (5) Dickens

yelled at and talked down to Krening; (6) Dickens gave jobs to Austin Barker and told him more

about the plans for the engine than Krening; (7) Dickens ordered Krening to stop joking with the

other people in the shop; (8) Dickens "cut Krening down" every time Krening talked to him; (9)

Krening heard a rumor that Dickens said that Ed Smith wasn't "pretty enough" for the steam

shop program; (10) Dickens micromanaged Krening by telling him to do things that Krening

already knew needed to be done; (11) Krening feared Dickens because he was scared Dickens

would dismiss him because Dickens framed employees to get rid of them; and (12) Dickens

talked about guns. Doc. 50-2, pp. 11-30, 40-41.

        As discussed in detail below, the Court finds that, unlike in *Strickland*, the facts in this

case are susceptible to but one interpretation and thus finds it can rule as a matter of law.  Even

viewing these facts in the light most favorable to Krening, the Court finds that Krening has not

established genuine issues of material facts related to his alleged constructive discharge and

cannot demonstrate that a reasonable person in his situation would have felt compelled to take a

medical leave of absence because of his employer's discriminatory actions and other aggravating

factors.

        The Court finds that the Tenth Circuit Court of Appeal's summary of constructive

discharge cases in *Fischer v. Forestwood Co.*, 525 F.3d 972, 979 (10th Cir. 2008) worth reciting:

> Several cases show the type of evidence plaintiffs must produce to meet their
> burden. For example, in *Acrey v. American Sheep Industry Ass'n,* 981 F.2d 1569,

22

1574 (10th Cir.1992), we concluded a plaintiff alleging discrimination under the Age Discrimination in Employment Act produced sufficient evidence establishing she was constructively discharged. On multiple occasions, her supervisor asked her to quit, citing her age and her image. Furthermore, her supervisor repeatedly confronted her with a litany of performance shortcomings. The supervisor took away longstanding job responsibilities and gave the employee inadequate information and training to perform her new responsibilities. The plaintiff, "too tired" to fight, finally resigned. *Id.* Because the supervisor made it nearly impossible for the plaintiff to continue performing her job, we concluded she was constructively discharged.

But an employee cannot survive summary judgment merely by producing evidence showing that working conditions were difficult or unpleasant. *Exum,* 389 F.3d at 1135. For example, in *PVNF,* 487 F.3d at 794, the EEOC produced evidence demonstrating that the defendant repeatedly subjected female employees to sexually explicit and derogatory remarks. Even so, we concluded the EEOC failed to produce sufficient evidence demonstrating working conditions were so intolerable that a female employee who quit was constructively discharged. *Id.* at 806.

Likewise, in *Daemi v. Church's Fried Chicken, Inc.,* 931 F.2d 1379 (10th Cir.1991), an Iranian supervisor sued his employer under Title VII for constructive discharge. The plaintiff produced evidence showing that he resigned because his employer (1) made derogatory remarks about the fact that he was Iranian, (2) ordered him to take a polygraph examination because of his national origin, (3) belittled and mistreated him at company seminars, and (4) ordered him to fire or eliminate other Iranians employed by the company. *Id.* at 1384. Despite this harassment, we concluded these conditions did not make the workplace sufficiently intolerable that the plaintiff was constructively discharged. *Id.* at 1386.

Even some evidence of discriminatory animus in the workplace will not necessarily establish a constructive discharge claim. *See Penn. State Police v. Suders,* 542 U.S. 129, 147, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) ("A hostile-environment constructive discharge claim entails something more [than conduct that amounts to actionable harassment]"); *Bennett v. Quark, Inc.,* 258 F.3d 1220, 1229 (10th Cir.2001), *overruled on other grounds by Boyer v. Cordant Technologies, Inc.,* 316 F.3d 1137, 1140 (10th Cir.2003) ("[A] finding of constructive discharge may not be based solely on a discriminatory act; there must also be aggravating factors that make staying on the job intolerable.") (internal quotation marks omitted); 1–15 *Larson on Employment Discrimination* § 15.08 (2007) ("The mere existence of discrimination will not normally constitute the kind of intolerable conditions that would make a reasonable person feel compelled to quit.").

*Fischer v. Forestwood Co.*, 525 F.3d 972, 980–82 (10th Cir. 2008).  In *Fischer*, Fischer alleged that he was heckled at work, his employer refused to hire or interview anyone for employment who was not a member of the FLDS church, and his employer fired another employee who was not a member of the FLDS church.  *Id.*  The court in *Fischer* went on to hold that Fischer failed to produce sufficient evidence demonstrating his working conditions were so intolerable that he was forced to quit and upheld the lower court's grant of summary judgment. *Id.*

Even believing all of the comments Dickens allegedly made about age occurred, the Court finds that Krening's claim cannot survive summary because "some evidence of discriminatory animus in the workplace will not necessarily establish a constructive discharge claim." *Id.* (citing *Penn. State Police v. Suders,* 542 U.S. 129, 147, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) ("A hostile-environment constructive discharge claim entails something more [than conduct that amounts to actionable harassment]").  Most of Dickens' comments were not directed toward Krening.  In fact, in his deposition, Krening testified that the only activity Dickens "engaged in toward Krening that happened because of his age" was Dickens telling Krening to go ask Austin Barker questions and Dickens making general comments about people getting close to their retirement ages and slowing down.  Doc. 53-1, p. 28.  Krening admitted that Dickens never said that Krening was slowing down and Krening never discussed retirement with Dickens.  Doc. 53-1, p. 28.

Krening relies heavily on his allegations that Dickens forced other employees out of the shop because of their age, but admits that he does not have any firsthand knowledge of any of the reasons for their departures.  Additionally, Chavez claims that Dickens harassed other older employees in her affidavit.  These allegations, viewed in the light most favorable to Krening, are

24

insufficient to establish a constructive discharge claim.  The Tenth Circuit Court of Appeals has held that evidence that an employer "engaged in discriminatory acts against other employees or potential employees [] is not enough to prove constructive discharge." *Fischer*, 525 F.3d at 982 (citing *PVNF,* 487 F.3d at 805–06; *Daemi,* 931 F.2d at 1385–86).

The Court believes Krening that his work environment was unpleasant and difficult, but an unpleasant work environment is insufficient to survive a motion for summary judgment in this instance.  For example, Krening did not produce evidence or genuine issues of facts that Dickens encouraged him to quit or actively undermined his ability to do his job.  Krening fails to give a reasonable explanation for why he feared Dickens or feared losing his job aside from his unsubstantiated assumptions that Dickens forced others to leave after Dickens asked Krening his opinion about these employees.  It is undisputed that Dickens never said he wanted Krening to quit, never disciplined him, never encouraged him to resign or leave his position, and never said that Krening was not doing a good job.  Thus, this case is distinguishable from *Acrey* because Dickens did not confront Krening with "a litany of performance shortcomings," did not deny Krening information necessary to perform his responsibilities, and never cited Krening's age.  Furthermore, Cross's affidavit states that Dickens created a hostile work environment for Cross who is twenty years old.  This seems to contradict the premise that Dickens' inappropriate actions were age-based.

Chavez stated in her deposition that Dickens refused to pull Krening out of service for medical purposes even though Dickens knew something was wrong with Krening.  The Court, however, finds that this too is insufficient to prove constructive discharge.  A constructive discharge occurs only "when an employer, ***through unlawful acts***, makes working conditions so

25

intolerable that a reasonable person in the employee's position would feel forced to resign."
*Fischer v. Forestwood Co.*, 525 F.3d 972, 979 (10th Cir. 2008) (emphasis added) (citing *Exum,*
389 F.3d at 1135). There is no evidence before the court that demonstrates a failure to pull
Krening out of service was an unlawful act or that it was based on Krening's age. Had Krening
sufficiently established age-based discrimination, the Court may have considered Krening's
health (both mental and physical) and working long hours as an aggravating factor that may have
made working conditions intolerable. But the Court has not found that there is sufficient
evidence to establish a genuine issue of fact related to age-based discrimination.

This is also the case with Krening's claim that UPRR caused his diabetes or caused it to
be exacerbated. Many work environments are stressful and people with disabilities, both mental
and physical, may need and frequently are entitled to accommodations to allow them to perform
their job duties. Krening, however, did not bring a claim under the Americans with Disability
Act. Thus, the Court need not consider whether he was denied an accommodation, unless there
is evidence that he was denied an accommodation because of his age. There is no such evidence.
Additionally, there is no evidence that Krening requested an accommodation to work less hours
or complained to his Union about working long of hours. Thus, the Court finds that Krening
could have requested an accommodation (transfer, intermittent FMLA leave, shorter working
hours, etc.) as an alternative to taking medical leave if his interaction with Dickens caused his
health issues.

The Court finds Krening's allegations of age-based harassment and constructive
discharge are tenuous, even compared to other harassment-type constructive discharge cases
cited above, in which the Tenth Circuit did not find sufficient grounds for a constructive

26

discharge.  Krening is stretching and twisting facts in order to survive summary judgment.  The

Court cannot find any legitimate ties to age-related discrimination or harassment that rises to the

level of intolerable work environment.[6]  In sum, looking at the totality of the circumstances in an

objective light, the evidence of record (Dickens' close supervision, micromanagement, direction

to Krening to ask Barker questions, reference to a group as the "Old Regime," name calling,

referring to himself as the dictator, changing directions and Krening's fear of dismissal, etc.)

does not support a reasonable inference that Krening's work conditions had become intolerable.

The Court finds that Krening's health may have left him no other choice but to take medical

leave, but the conditions of the work environment did not.  The Court further finds that a

reasonable jury could not find that a reasonable person in Krening's position would have no

alternative but to take medical leave due to the unlawful acts of his employer and an intolerable

work environment.  Thus, the Court finds that Krening's theory of a constructive discharge

cannot meet the "adverse employment action" element of Krening's prima facie case of

discrimination.

 The Court notes that Krening asserted other various adverse employment actions in his

response to summary judgment, specifically that Dickens reassigned Krening's job duties to a

younger person, micromanaged, scrutinized, and demeaned his work, falsely accused Krening of

---

[6] Boiling all of the allegations down, based on the affidavits Krening uses to support his claim,
the following are the allegations that are age-related: Dickens used the term "Old Regime"
frequently, Dickens made an age-based comment to Lynn Nystrom, Dickens told Ed Smith that
"You know, we've seen this over the years. As guys get closer to retirement, they back off and
don't do what they should." And "You know, as guys get older, they slack off", Dickens asked
Krening to ask Barker questions and told Barker more about the steam engine, Dickens relied on
Barker's opinion more than Krening's, Dickens said Krening was weak and wouldn't last as
Foreman General, John Rimmasch had the impression that Dickens did not like the older guys in
the crew; and Dickens allegedly "ran off" older member of the crew.

taking short cuts and damaging equipment, made Krening the brunt of jokes, and made Krening

live in fear of losing his job.

> An adverse employment action constitutes 'a significant change in employment
> status, such as hiring, firing, failing to promote, reassignment with significantly
> different responsibilities, or a decision causing a significant change in benefits.' "
> *Annett,* 371 F.3d at 1237 (quoting *Burlington Indus., Inc. v. Ellerth.* 524 U.S. 742,
> 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). Although what constitutes an
> "adverse employment action" is inherently a fluid and fact-based consideration,
> "a mere inconvenience or an alteration of job responsibilities will not suffice." *Id.*
> at 1239 (quotations omitted).

*Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006).

The Court finds that there is no record of Dickens reassigning job responsibilities from

Krening to Barker.  Krening testified that Dickens shared more information about the engine

plans with Barker and asked Krening to ask Barker's opinion on things.  This, however, does not

constitute a reassignment with significantly different responsibilities.  It is undisputed that

Dickens did not discipline Krening, demote Krening, fire Krening, fail to promote Krening, etc.

Thus, the Court finds there is no evidence establishing a genuine issue of material fact that

Krening was a victim of an adverse employment action.  Accordingly, the Court finds that

Krening is unable to satisfy his prima facie case of age-based discrimination under the ADEA.

The Court will not consider Defendant's remaining arguments regarding Plaintiff's *prima facie*

case.  The Court grants summary judgment in favor of Defendant on this claim.

### 4.      Hostile work environment claim

Krening next alleges he was subjected to a hostile work environment because of his age.

"For a hostile environment claim to survive a summary judgment motion, a
plaintiff must show that a rational jury could find that the workplace [was]

28

permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Penry v. Fed. Home Loan of Topeka*, 155 F.3d 1257, 1261 (10th Cir.1998) (quotation omitted). To evaluate whether a working environment is sufficiently hostile or abusive, we examine all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In addition, the environment must be both subjectively and objectively hostile or abusive. *Id.; see also Davis v. U.S. Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998).

The Supreme Court has instructed that courts judging hostility should filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of age-related jokes, and occasional teasing. *See e.g. Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)(sex discrimination). This screening is in place to ensure that Congressional enactments such as the ADEA do not become trivialized as a civility code. *Id.* In particular, courts should filter out offhand comments, and isolated incidents (unless extremely serious).

*MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005). Krening claims Dickens harassed him by (a) asking him about tasks he was doing, (b) criticizing Krening's direct reports, (c) allegedly requiring him to falsify documents, (d) by creating hostility between two other employees even though Krening admits that he was not aware of what their conflict was about, and (e) by causing "everyone" to worry about losing their jobs.  As discussed above, Krening claims he was shaking once when Dickens raised his voice at him because he feared he would lose his job and knew Dickens had a gun.

The Court finds that Krening allegations do not establish a genuine issue of material fact as to whether he was the victim of a hostile work environment.  There is no tie between Krening's allegations and his age.  Thus, there is insufficient evidence to establish a genuine issue of fact that Krening's work environment permeated with **discriminatory** intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment. As discussed above, the Court believes Krening that he found his work environment to be unpleasant. The Court does not find any of Krening's allegations to objectively abusive or discriminatory. The Court finds that no reasonable jurors would differ on the issue of whether the conduct was age-based or discriminatory, frequent, severe, involved physical threats, or unreasonably interfered with Krening's work performance. Accordingly, the Court finds that a reasonable jury could not find that Krening was the victim of a hostile work environment and grants summary judgment on this claim in favor of Defendant.

## CONCLUSION

For the reasons discussed above, the Court concludes that Defendant met its burden under Fed. R. Civ. P. 56 to establish that no genuine dispute of material fact exists for trial on Krening's claims of 1) intentional infliction of emotional distress; 2) negligent infliction of emotional distress; 3) negligent hiring, 4) negligent retention, 5) negligent supervision of Krening's supervisor, Dickens; and 6) age discrimination and hostile work environment. Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 46) in its entirety. Therefore, it is

**ORDERED** that Defendant's Motion for Summary Judgment (Doc. 46) shall be and hereby is, **GRANTED.**

Judgment shall be entered accordingly.

Dated this _25th_ day of August, 2016.

Alan B. Johnson
United States District Judge

30